# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

**MONGOMERY** _____ County

| For Prothonotary Use Only: | |
|---|---|
| Docket No: | |

_The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court._

**Commencement of Action:**

☒ Complaint   ☐ Writ of Summons   ☐ Petition   ☐ Notice of Appeal
☐ Transfer from Another Jurisdiction   ☐ Declaration of Taking

Lead Plaintiff's Name: **LINCOLN GRISWOLD**

Lead Defendant's Name: **COVENTRY FIRST LLC**

☐ Check here if you are a Self-Represented (Pro Se) Litigant

Name of Plaintiff/Appellant's Attorney: **GERARD M. MCCABE, ESQUIRE**

Are money damages requested? : ☒ Yes   ☐ No

Dollar Amount Requested: (Check one)   ☐ within arbitration limits   ☒ outside arbitration limits

Is this a **Class Action Suit?**   ☒ Yes   ☐ No

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** (_do not include Mass Tort_)
☒ Intentional
☐ Malicious Prosecution
☐ Motor Vehicle
☐ Nuisance
☐ Premises Liability
☐ Product Liability (_does not include mass tort_)
☐ Slander/Libel/ Defamation
☐ Other:

**MASS TORT**
☐ Asbestos
☐ Tobacco
☐ Toxic Tort - DES
☐ Toxic Tort - Implant
☐ Toxic Waste
☐ Other:

**PROFESSIONAL LIABLITY**
☐ Dental
☐ Legal
☐ Medical
☐ Other Professional:

**CONTRACT** (_do not include Judgments_)
☐ Buyer Plaintiff
☐ Debt Collection: Credit Card
☐ Debt Collection: Other

☐ Employment Dispute: Discrimination
☐ Employment Dispute: Other

☐ Other:

**REAL PROPERTY**
☐ Ejectment
☐ Eminent Domain/Condemnation
☐ Ground Rent
☐ Landlord/Tenant Dispute
☐ Mortgage Foreclosure
☐ Partition
☐ Quiet Title

☐ Other:

**CIVIL APPEALS**
Administrative Agencies
☐ Board of Assessment
☐ Board of Elections
☐ Dept. of Transportation
☐ Zoning Board
☐ Statutory Appeal: Other

Judicial Appeals
☐ MDJ - Landlord/Tenant
☐ MDJ - Money Judgment
☐ Other:

**MISCELLANEOUS**
☐ Common Law/Statutory Arbitration
☐ Declaratory Judgment
☐ Mandamus
☐ Non-Domestic Relations Restraining Order
☐ Quo Warranto
☐ Replevin

☐ Other:

Pa.R.C.P. 205.5

2/2010

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

## NOTICE

**Pennsylvania Rule of Civil Procedure 205.5. (Cover Sheet) provides, in part:**

**Rule 205.5.    Cover Sheet**

(a)(1)   This rule shall apply to all actions governed by the rules of civil procedure except the following:

(i)      actions pursuant to the Protection from Abuse Act, Rules 1901 et seq.

(ii)     actions for support, Rules 1910.1 et seq.

(iii)    actions for custody, partial custody and visitation of minor children, Rules 1915.1 et seq.

(iv)     actions for divorce or annulment of marriage, Rules 1920.1 et seq.

(v)      actions in domestic relations generally, including paternity actions, Rules 1930.1 et seq.

(vi)     voluntary mediation in custody actions, Rules 1940.1 et seq.

(2)     At the commencement of any action, the party initiating the action shall complete the cover sheet set forth in subdivision (e) and file it with the prothonotary.

(b)     The prothonotary shall not accept a filing commencing an action without a completed cover sheet.

(c)     The prothonotary shall assist a party appearing pro se in the completion of the form.

(d)     A judicial district which has implemented an electronic filing system pursuant to Rule 205.4 and has promulgated those procedures pursuant to Rule 239.9 shall be exempt from the provisions of this rule.

(e)     The Court Administrator of Pennsylvania, in conjunction with the Civil Procedural Rules Committee, shall design and publish the cover sheet.  The latest version of the form shall be published on the website of the Administrative Office of Pennsylvania Courts at www.pacourts.us.

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY,
PENNSYLVANIA

LINCOLN T. GRISWOLD, INDIVIDUALLY AND
LINCOLN T. GRISWOLD, AS THE FORMER MAJORITY
PARTNER AND OWNER OF THE LINCOLN T.
GRISWOLD FAMILY LLP

             VS.                                                    NO.

COVENTRY FIRST, LLC, THE COVENTRY GROUP, INC.
MONTGOMERY CAPITAL, LLC, COVENTRY FINANCIAL, LLC
AND REID S. BUERGER

## NOTICE TO DEFEND-CIVIL

You have been sued in court. If you wish to defend against the claims set forth in the following
pages, you must take action within twenty (20) days after this complaint and notice are served,
by entering a written appearance personally or by attorney and filing in writing with the court
your defenses or objections to the claims set forth against you. You are warned that if you fail to
do so the case may proceed without you and a judgment may be entered against you by the court
without further notice for any money claimed in the complaint or for any other claim or relief
requested by the plaintiff. You may lose money or property or other rights important to you.

     YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT
HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS
OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

     IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO
PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL
SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYER REFERENCE SERVICE
MONTGOMERY BAR ASSOCIATION
100 West Airy Street (REAR)
NORRISTOWN, PA 19401

(610) 279-9660, EXTENSION 201

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

R. ERIC. KENNEDY (OH ID # 0006174)
DANIEL P. GOETZ (OH ID # 0065549)
WEISMAN, KENNEDY & BERRIS, CO., L.P.A.
101 Prospect Ave. West
Suite 1600 Midland Building
Cleveland, Ohio 44115
(216) 781-1111
(216) 781-6747 (fax)
dgoetz@weismanlaw.com

GERARD M. MCCABE, ESQUIRE (PA ID # 66564)
PAUL J. SCHOFF, ESQUIRE (PA ID # 38993)
SCHOFF MCCABE, P.C.
Mt. Airy Conference Center, Suite 201
7208 Germantown Avenue
Philadelphia Pennsylvania 19119
(215) 320 -7200 (office)
(215) 531-5562 (facsimile)
gmccabe@schoffmccabe.com

CHRISTOPHER P. THORMAN (OH ID#0056013)
PETER HARDIN-LEVINE (OH ID# 0014288)
DANIEL P. PETROV (OH ID# 0074151)
MARK GRIFFIN (OH ID# 0064141)
THORMAN & HARDIN-LEVINE, L.P.A.
The Bradley Building
1220 West Sixth Street, Suite 207
Cleveland, Ohio 44113
(216) 621-9767
(216) 621-3422) (fax)
mgriffin@thllaw.com

**ATTORNEYS FOR PLAINTIFF
LINCOLN T. GRISWOLD,
INDIVIDUALLY, AND AS THE
FORMER MAJORITY PARTNER OF THE
LINCOLN T. GRISWOLD FAMILY LLP**

---

# IN THE COURT OF COMMON PLEAS, MONTGOMERY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| LINCOLN T. GRISWOLD, individually, and LINCOLN T. GRISWOLD, as the former majority partner and owner of the Lincoln T. Griswold Family LLP | : : : : | CIVIL ACTION – LAW |
| | : | TRIAL DIVISION |
| Plaintiff, | : : : | SEPTEMBER TERM 2010 |
| v. | : : | |
| COVENTRY FIRST, LLC | : | No: _____ |
| 7111 Valley Green Road | : | |
| Fort Washington, Pennsylvania 19034 | : : | **Trial by Jury Demanded** |
| THE COVENTRY GROUP, INC. | : | |
| 7111 Valley Green Road | : | |
| Fort Washington, Pennsylvania 19034 | : : | **CLASS ACTION COMPLAINT** |
| MONTGOMERY CAPITAL, INC. | : | |
| 7111 Valley Green Road | : | |
| Fort Washington, Pennsylvania 19034 | : | |
| | : | |
| COVENTRY FINANCIAL, LLC | : | |
| 7111 Valley Green Road | : | |
| Fort Washington, Pennsylvania 19034 | : | |
| | : | |

REID S. BUERGER                         :
91 Stenton Avenue                       :
Plymouth Meeting, Pennsylvania 19462    :
                                        :
                        Defendants.     :

---

### CLASS ACTION COMPLAINT

**NOW COMES, Plaintiff Lincoln T. Griswold,** in his individual capacity and as the

former majority partner of the Lincoln T. Griswold Family LLP (the "Griswold LLP"), a Georgia

limited liability partnership, that itself was the sole beneficiary of, and Lincoln T. Griswold as

the sole settlor of, the Lincoln T. Griswold Irrevocable Trust, dated 12/02/2005 (the "Trust"), by

and through his attorneys, and for his Class Action Complaint against defendants named herein,

on behalf of himself and a class of similarly situated persons (the "Plaintiff Class"), demanding

damages of such defendants herein in a sum in excess of Fifty Thousand ($50,000.00), and in

excess of any local arbitration limits, exclusive of interests, costs and damages for pre-judgment

delay, allege, upon information and belief, as follows:

### PRELIMINARY STATEMENT

1.      This case arises from the pervasive fraud committed against Plaintiff and the

Plaintiff Class, including activity as found by the New York Attorney General and the Florida

Office of Insurance Regulation.[1]

2.      Law enforcement authorities in New York and Florida found "pervasive fraud in

what is called the 'life settlements' business, where investors buy life insurance policies from

owners at a discount, pay the premiums as they come due, and ultimately collect the death

benefits for a profit." The fraud arises from illegal collaboration between life settlement

---

[1]This Complaint restates and re-alleges many of the factual findings of these law enforcement organizations as set
forth below.

2

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

professionals to restrain trade and to conceal the fees charged.  For example, Defendant

Coventry First ("Coventry"):

- Entered into secret agreements to eliminate competition by paying its competitors to refrain from bidding on insurance policies;[2]

- Entered into secret agreements with Brokers to breach their fiduciary duties to clients by inducing the Brokers to never use Coventry's offers "to entice competitors to beat this offer;"[3]

- Misappropriated valuable life insurance policies from elderly citizens by misrepresenting the amount and nature of fees paid and prices bid;[4]

- Falsified transaction documents to hide the true nature and amount of fees paid;[5]

- Falsified disclosure documents;[6]

- Improperly increased interest or cost payments or estimates in order to force seniors to viaticate their policies to Coventry; and

- Paid improper or undisclosed fees to agents.

3.        When confronted with its conduct by New York law enforcement officials,

Coventry's Executive Vice-President Defendant Reid S. Buerger repeatedly invoked the Fifth

Amendment and refused to answer questions.[7]

4.        Defendants prey on the owners of life insurance policies by employing several

schemes.

5.        First, Defendants pretend to participate in or conduct auction-style bidding or

price-shopping to get the highest price for owners considering selling their life insurance

policies. In fact, the bidding is often rigged, with Defendants paying the brokers undisclosed

---

[2]New York Attorney General Document ("NYAG Doc.") No. Cov. NJ 00024690 (finding fraudulently termed "co-broker" kickback fees of up to $100,000 to prevent competitors from bidding on an insurance policy).
[3]NYAG Doc. No. 441505.
[4]*Mark H. Luber, et al. v. Bedrock Funding LLC, et al.,* CCP Case No. 2010-00981 (Montgomery County, PA)
[5]NYAG Doc. No. BIS002207-2209.
[6]NYAG Complaint, ¶5.
[7]NYAG Complaint, ¶¶ 29, 35, 47, 55, 64.

3

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

fees, euphemistically called "co-brokering fees," to "sit on" or reduce competitive bids from other buyers (the "<u>Bid Rigging Scheme</u>").

6.    In a typical Bid Rigging Scheme, involving for example a trust-owned policy insuring an elderly New York couple, Coventry offered $880,000 in October 2004, in return for the 80 year-old woman's life insurance policy, which would pay $4.9 million on her death. Shortly thereafter, Coventry learned that another buyer, acting through a broker, AllSettled Group, Inc. ("<u>AllSettled</u>"), was ready to offer over $1,000,000 for the same policy. Coventry offered AllSettled a $49,000 "fee" to suppress this competing bid, sending AllSettled an encoded email on November 2, 2004, stating "for [initials of insured], the number is 49." In return for this secret payment, AllSettled never informed the policy owner of the higher offer and closed its file on the matter. The New York Attorney General's investigation has found dozens of similar examples involving Coventry making payments to suppress competing offers.

7.    Second, Coventry systematically and deliberately induces and participates in breaches of fiduciary duty by life settlement brokers who, by law, owe fiduciary duties to their elderly clients.  Coventry secretly provides brokers with what is called a "gross offer" for the seller's life insurance policy (the "<u>Gross Offer Scheme</u>").  The Gross Offer Scheme involves a lump-sum amount to be divided between the broker and Coventry at the broker's discretion. The amount of the gross offer is never disclosed to the seller.   Coventry also enters into premium financing arrangements, escrow agreements, or power of attorney arrangements, which permit it to improperly or excessively charge interest or fees so that senior citizens are effectively forced into transferring their policies to Coventry.

8.    Unbeknownst to the elderly seller, the less money the seller gets, the more the broker keeps. The broker, thus, has every incentive to convince the owner that his or her policy

4

is worth as little as possible. Coventry intentionally encourages and **causes** the brokers to violate their fiduciary duties by keeping higher secret commissions and reducing the net amount received by their elderly clients.

9.      One of the purposes of the Gross Offer scheme is to encourage brokers to viaticate policies to Coventry by allowing them to take larger commissions or fees at the expense of their clients.

10.      The results are alarming: in one instance a broker took a gross offer of $822,500 for a policy purchased by Coventry and convinced his client to take $365,000 as a purchase price, keeping $457,500 for himself as a "commission." The purpose and effect of Coventry's Gross Offer Scheme is to induce Brokers to sell the policy to Coventry, and at a lower price, by allowing Brokers to secretly steal from their clients.

11.      Coventry makes no disclosures to elderly sellers about its gross offers. If a seller asks about Broker compensation, Coventry refuses to answer.

12.      Coventry also generates false documents that conceal all or a portion of the fees which the Broker receives from the gross offer.

13.      Specifically, Defendants committed fraud and induced others to breach their fiduciary duties to Plaintiff by paying out undisclosed and unauthorized commissions.

### PLAINTIFF and DEFENDANTS

14.      Plaintiff Lincoln Griswold is an adult individual who is domiciled at 364 Founders Village, Lansdale, Pennsylvania 19466, located within Montgomery County, Pennsylvania. Lincoln Griswold was the insured for the Policy (as defined herein). Lincoln Griswold was also a partner of the Griswold LLP, with Lincoln Griswold owning ninety-nine percent (99%) of the Griswold LLP which was a Georgia limited liability partnership.

5

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

15.     Defendant Coventry First, LLC ("Coventry"), a Delaware limited liability company, has a place of business at 7111 Valley Green Road, Fort Washington, Pennsylvania 19034, located in Montgomery County.  Coventry acted at all times relevant to this Complaint through its employees and agents in this County.

16.     Defendant The Coventry Group, Inc. ("TCG"), a Pennsylvania corporation, has a place of business at 7111 Valley Green Road, Fort Washington, Pennsylvania 19034, located in Montgomery County.

17.     Defendant Montgomery Capital, Inc. ("Montgomery"), a Delaware corporation, has a place of business at 7111 Valley Green Road, Fort Washington, Pennsylvania 19034, located in Montgomery County.

18.     Defendant Coventry Financial, LLC, ("CF"), a Delaware limited liability company, has a place of business at 7111 Valley Green Road, Fort Washington, Pennsylvania 19034, located in Montgomery County.

19.     Defendant Reid S. Buerger ("Buerger") is an adult individual with an address of 91 Stenton Avenue, Plymouth Meeting, Pennsylvania 19462, located in Montgomery County.

## OTHER RELEVANT ENTITIES & PERSONS

20.     The Trust was an irrevocable trust formed in the State of Georgia on December 2, 2005, pursuant to a trust formation document (the "Trust Charter").  The Trust was the owner of the Policy.  The sole settlor of the Trust was Lincoln Griswold and the sole beneficiary of the Trust was the Griswold LLP.

21.     Wells Fargo Bank, N.A. ("Wells Fargo"), is a national banking association that acted as Trustee to the Trust (the "Trustee").  The Trustee's principal place of business is 7000 Central Parkway NE, Suite 550, Atlanta, Georgia 30328.

6

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

22.     Bedrock Funding, LLC ("Bedrock") is a Georgia limited liability company with a business address of 303 Harper Drive, Moorestown, New Jersey 08057.

23.     Mid-Atlantic Financial LLC ("Mid-Atlantic") is a New Jersey limited liability company with a business address of 303 Harper Drive, Moorestown, New Jersey 08057.  Mid-Atlantic is an affiliated parent holding company to Bedrock.

24.     William R. Schantz ("Schantz") is an adult individual who was and is the Chief Executive Officer of Bedrock and Mid-Atlantic operating from Bedrock's business address.

25.     Joseph A. Fede ("Fede") is an adult individual who was and is the Chief Financial Officer of Bedrock and Mid-Atlantic operating from Bedrock's business address.

### JURISDICTION AND VENUE

26.     This Court has jurisdiction over the parties by virtue of 42 Pa. C.S.A. §§ 5301, 5322.

27.     Venue is proper in this County because Plaintiff owns a residence in this County and many of Defendants and much of the alleged conduct set forth in this Complaint occurred or are located in this County.

### FACTUAL BASIS

I.     **The Life Settlement Industry**

A.     **Background**

28.     A "life settlement" is the sale of a life insurance policy in return for a purchase price that typically exceeds the surrender value of the policy. Such policies typically involve insureds who are high net worth individuals 75 years or older with more than two years of life expectancy. These policies are often owned by trusts or companies, though in some instances the owners are the elderly insured individuals themselves.

7

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

29.     Elderly policy owners who want to sell their policies seek the highest possible price for their policies.  The buyers are investors who, after purchasing the policy, continue to pay the premiums until the insured dies. Upon the insured's death, the buyers claim the policy's death benefit.

30.     The economics of these deals are straightforward: the investor wagers that the value of the future death benefit will exceed the purchase price and costs of paying premiums until the insured dies. In turn, the seller prefers an immediate lump sum payment as opposed to the alternative of paying premiums for an eventual death benefit.

**B.      History of Life Settlements**

31.     The life settlement industry developed in the late 1990s involving elderly individuals usually with two or more years of life expectancy.  The life settlement industry has exploded in the past ten years. In 2008, for example, viatical investors purchased life insurance policies with death benefits estimated at $12 billion. One research analyst has predicted that the business will grow more than ten-fold to $160 billion over the next several years. (Bernstein Research Call, March 4, 2005). An industry newsletter has compared the industry's fast dollars and lack of regulation to that of the Old West:

> Saddle up partner `cuz your [sic] in for some kind of ride. It's easy to compare the early days of the life settlement industry to the Wild West, with its mad rush for gold, freedom to roam, and cowboy-like bravado. But the industry has changed quite a bit since then. The dust has settled, boundaries have been drawn, and lone rangers replaced by corporate giants. Although the industry is much more sophisticated today, those early promises of golden nuggets still exist. (NYAG Doc. Cov. 1027931).

32.     Similarly, a life settlement broker's website once offered a caricature of a prospector in front of a saloon, with a banner overhead reading: "Welcome to Cashville" (http://www.tecsc.com) (circa 03/29/06).

8

33.     By law, Brokers are fiduciaries for their elderly clients.

**C.     Structure of the Life Settlement Market**

34.     The life settlement business has evolved into a multi-tiered industry, consisting of Sellers, Brokers, and Buyers. The role of each is described below.

35.     First, there is the Seller. As described above, the Seller is an owner of a policy insuring the life of an elderly person usually with two or more years of life expectancy.

36.     On behalf of the Seller, the Broker(s) is supposed to submit the policy to multiple buyers ("Buyers") such as Coventry for bids.

37.     The purpose of the submission to multiple Buyers is to garner the highest price for the benefit of the Seller.

38.     In theory, the industry operates on an auction model, with Brokers serving as auctioneers, soliciting bids from competing Buyers to submit to the Seller for the policy. Brokers are supposed to act on the Seller's behalf and shop the policy to different Buyers.

39.     In order to induce the Brokers to breach their fiduciary duties to their clients to find the highest bid, Coventry will submit what is called a "gross offer" to a Broker.

40.     A gross offer is a single lump sum offer to the Broker for the purchase of a life insurance policy. From this "gross" or lump sum amount, the Broker will then determine what portion of the gross offer to present to the Seller as the "purchase price" and how much to keep for itself, the Broker. The Broker, however, only presents to the Seller a net price, keeping both the gross offer and the Broker's compensation hidden from the Seller.

41.     In a true auction there would be multiple rounds of offers submitted by competing Buyers who outbid each other in an effort to win the deal.

42.     For the purpose of restraining this competition, Coventry requires that Brokers

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

9

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

agree to not "shop" its gross offer after they receive it.

43.     After Coventry's offer is accepted, the Broker informs Coventry how the gross offer will be divided between the Seller and the Broker. The Broker communicates no information regarding the terms of the transaction to the Seller other than informing the Seller of the remaining net purchase price, concealing both the gross offer and the commission it took for itself. The Broker also conceals the extent of his discretion to adjust the amount of any commission or correspondingly reduce the net amount received by the Seller.

44.     When the Broker submits a life settlement application to Coventry, its Financial Analysis group processes the actuarial data, estimates life expectancies and determines the pricing for the policy. The policy is then sent to the Financial Underwriting group, headed by Defendant Buerger. Buerger and his team then determine the gross offers. As described above, the gross offer encompasses broker compensation. However any special compensation arrangements, including co-broker payments and bonuses, are approved by Buerger himself. As one email explained, "Eileen [Shovlin, Coventry regional manager] talks to [the Broker] about their cases and Reid [Buerger] about co-brokers." (NYAG DOC. COVJD 00022580).

45.     Brokers owe fiduciary duties to their clients. According to an industry association: "It's important to recognize that the broker has a fiduciary role to represent the seller by law...the bottom line is that the broker's job is to fully represent the interests of the policy seller." (Life Insurance Settlement Association White Paper "Cashing in on Unneeded Life Insurance Policies," Aug. 22, 2006).

46.     Coventry recognizes that Brokers owe their clients a fiduciary duty.

47.     When it is advantageous to Coventry, it steps in to ensure that this duty is fulfilled. For example, on May 6, 2005, a Broker refused to present Coventry's offer to a Seller.

10

In response, a Coventry Regional vice president suggested, "perhaps I could push the fiduciary duty button and force him into presenting the offer to the client." (NYAG DOC. COVJD 00031940).

48.   In a similar situation earlier in 2005, Coventry was informed that another Broker would not present Coventry's higher offer to the Seller. Alan Buerger, Coventry's founder and CEO, directed that the Broker be reminded that it "is to act as a fiduciary for the client and we would be both disappointed and surprised if they chose not to act as a fiduciary . . . This is all the more relevant given all Coventry's recent conversations with [the Broker] about Spitzer, disclosure and liability . . . you may quote me!" (NYAG DOC. COVJD 00021726).

**II.   Coventry's Bid Rigging Scheme**

49.   In fact, the above auction model bears little relation to what really happens in the life settlement industry. Coventry has undermined competition in the life settlements business through a variety of schemes, the most egregious of which involves rigged bids for insurance policies.

50.   In late 2001, Coventry entered the life settlement industry as a Buyer (it had previously been a Broker). By early 2002, it had begun to pay undisclosed compensation, called "co-broker payments," to Brokers, who, in exchange, than those offered by Coventry, refrained from soliciting competitive bids or squelched higher bids, thus guaranteeing that Coventry won the "auction."

51.   A senior Coventry employee, Neal Jacobs, aptly described these payments as providing Coventry "insurance" that it would win the auction. (NYAG DOC. COV NJ 00012957). Some examples of the scheme are set out below.

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

**A.**   **A 79 year-old widower living in Hawaii**

52.   In mid-2003, a 79 year-old widower living in Hawaii decided to sell his $400,000 life insurance policy.  The policy was ultimately sold to Coventry on April 16, 2003, for $102,000 - - the Seller received $78,000 and his Broker received $24,000.

53.   The Seller was not aware that another Broker, Florida-based Life Settlement Alliance ("LSA")[4] had made a bid of $108,000, surpassing Coventry's, but LSA had refrained from presenting it in exchange for a co-broker fee payment from Coventry. In a March 5, 2003 email Jim Dodaro, Coventry's Vice President of Financial Underwriting, wrote to Buerger:

> [Jim Nutt, a senior employee of LSA] said he spoke with you a while back about co-brokering the . . . case. He is frustrated that we have not gotten it accepted. He said he is sitting on a 27% gross offer [$108,000] from Mutual and can probably get more. If we can't close he said he could and pay us a co-broker fee. (NYAG DOC. COV 1136766).

Ultimately, Coventry closed with a gross offer of $102,000 ($78,000 to the Seller and $24,000 to his Broker) and, as arranged by Buerger and Nutt, LSA received a co-broker payment from Coventry of $12,000 for not submitting the higher bid. LSA's sole contribution to the life settlement transaction was to "sit on" a competing offer to the detriment of the Seller. The co-broker fee was not disclosed to the Seller as part of Coventry's Purchase Agreement. (NYAG DOC. COV2 0006025).

54.   In September 2006, Buerger invoked the Fifth Amendment when asked whether he approved the co-broker payment to LSA in exchange for LSA to sit on the higher offer.

55.   LSA dissolved in mid-2005, after the U.S. Securities and Exchange Commission ("SEC") alleged that Mutual Benefits Corporation, a life settlement and viatical Buyer that was shut down by the SEC in 2004, violated an asset-freeze order by diverting $2.8 million from Mutual Benefits to LSA. In May 2005, LSA's three senior officials left LSA and started a new

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

Broker called Life Insurance Settlements, Inc. ("LIS") which continues to do business with Coventry.

**B.   A trust-owned policy insuring a New York woman in her eighties**

56.     In another case, a family trust decided to put a $4.9 million policy insuring an 80 year-old woman on the market through a Broker. The Broker solicited bids directly from Coventry as well as from AllSettled, a New York Broker. In September 2004, Coventry made a gross offer of $705,000 for the policy. (NYAG DOC. COV 1142334). Coventry learned in October 2004 that it was competing against an offer from another Buyer of $880,000 submitted by AllSettled. Neal Jacobs, Coventry's Director of Financial Underwriting contacted AllSettled's President, Michael Krasnerman ("Krasnerman"), to work out a deal. According to an October 28, 2004 email from Jacobs, Krasnerman requested a payoff of 1.5 percent of the death benefit to drop out of the bidding process. Jacobs reported, "[Krasnerman] claims he would go well over $1M. [H]e asked for 1.5 pts. I offered .5 pt. [D]o we want to do that much?" (NYAG DOC. NJ 00027506). Ultimately, Coventry and AllSettled reached an agreement that Coventry would pay $49,000, equal to 1% (or 1 point) of the death benefit of the policy and in exchange AllSettled would agree to illegally restrain competition, and breach its fiduciary obligations, by not seeking other competitive bids.  The agreement was memorialized in an email from Jacobs to Krasnerman on November 2, 2004, stating "for [insured's initials], the number is 49." (NYAG DOC. NJ 00008934). On November 11, 2004, Lenore Saracino, AllSettled's Vice President of the Life Settlement Division, wrote by hand on the Status Report "[c]lose file[.] Have a co-brokering fee with Coventry." (AS 001166).

57.     On December 28, 2004, the trust received $800,000 for the policy and the Broker received $142,500 as compensation. Unbeknownst to the Seller, Coventry also paid AllSettled

13

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

$49,000 in exchange for stepping out of the bidding process. (NYAG DOC. COVNY 00013466).

**C.    A family-owned policy insuring a 79 year-old man**

58.    In another transaction, in late 2004, involving the policy insuring a 79 year-old man from New Jersey owned by a family member, Coventry offered directly to the Broker (the Seller's financial advisor) a $3,100,000 gross offer for a policy with a $10,000,000 death benefit. A competing Buyer offered $3,525,000. On December 15, 2004, near the end of the bidding process, AllSettled's Saracino forwarded Coventry's Neal Jacobs the competing offer of $3,525,000 she had received from another Buyer. She added in her email to Jacobs: "Call Michael Krasnerman on Thursday." Jacobs immediately forwarded AllSettled's offer to Buerger with the message: "see below for what he says is his latest offer on [case name]." (NYAG DOC. COV 441616). Rather than compete with AllSettled and raise its gross offer by at least $425,000, Coventry took the cheaper way out, entering into an illegal side deal with AllSettled: AllSettled would receive $200,000 in "co-broker fees" in exchange for not presenting its higher offer. Using the shorthand Coventry and AllSettled had developed for such matters, Jacobs sent an email to Krasnerman on December 16, 2004, stating "number is 200" (NYAG DOC. NJ 00010364) then followed up a few minutes later with an email to Coventry's accounting department: "[AllSettled is] now co-broker for $200K." (NYAG DOC. COV 441517). By paying AllSettled a co-broker payment of $200,000 for not competing, Coventry ensured that its gross offer remained unchanged at $3,100,000. The purchase closed on December 28, 2004, with the Seller receiving $2,946,947 and the Seller's original Broker receiving an additional $153,053.

59.    The Seller never learned that another Buyer was willing to pay $3,525,000 for the policy, nor that AllSettled received a co-broker payment for $200,000. (NYAG DOC. COV2 0009660, COV 441517).

14

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

D.   **A trust-owned policy insuring an 81 year-old man**

60.   In a transaction involving the sale of a trust-owned policy with a death benefit of $2.4 million policy, Stuart Kosloff ("Kosloff"), President of the East Coast Settlement Company, a Florida-based Broker, contacted Dodaro on October 13, 2004, and informed him that he had a $900,000 bid that had not yet been submitted to the Seller. Kosloff suggested that the two parties "work together" to ensure that Coventry would win the business. (NYAG DOC. COV 1132940). Dodaro sent an email on November 15, 2004 to Buerger seeking approval over the terms of the deal: "I told Stuart [Kosloff] we could pay 1 pt (24k). He said that wasn't enough (has around 920k gross) and asked for 50-60K." (NYAG DOC. COV 1132946). Three days later, having not heard from Coventry, Kosloff sent the following email to Dodaro threatening, "I need to hear a yes or a no before the end of the day or I have to up my offer to them." (NYAG DOC. COVJD 00025246). Dodaro repeated his request for Buerger's approval, and within a few hours, Buerger wrote back: "ok." (NYAG DOC. COV 1132946).

61.   Kosloff kept up his part of this collusive arrangement by not communicating this higher bid to the Seller and dropping out of the bidding. In a December 15, 2004 email from Kosloff to Dodaro, relating to a conversation Kosloff had earlier that day with the Seller's advisor, Kosloff wrote that the advisor "called this morning asking if I was all done bidding on [case name]. Told him I hated to say it but he should go with you." (NYAG DOC. COVJD 00017552). Coventry purchased the policy on January 31, 2005, for $825,000. As agreed, Coventry then paid Kosloff $50,000. (NYAG DOC. COVJD 00025357). The Seller was never told about Kosloff's higher offer or the co-broker payment to Kosloff. (NYAG DOC. COV2 0007151).

62.   In September 2006, Buerger invoked the Fifth Amendment when asked about the

15

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

purpose of Coventry's payment to Kosloff.

E.   **A company-owned policy insuring a 79 year-old woman**

63.   In a transaction involving a company-owned policy insuring a 79 year-old woman living in New Jersey, Coventry initially bid $620,000 on December 16, 2004. A few days later on December 22, 2004, Coventry increased its offer to $865,000. (NYAG DOC. NJ 00010495). Subsequently, Dodaro sent an email to Buerger on December 28, 2004, informing him that Pete Gaynor, another senior employee at LSA, told him: "We [Coventry] were one of 2 funders that offered on it. [A competing Buyer] was the other and are over 1M. Said he needs to hear from us by today or he is offering." (NYAG DOC. COVJD 00018719).

64.   In other words, LSA demanded to hear from Coventry regarding an illegal payoff or else it would disclose with the higher offer it had from a competing Buyer. Even though LSA was not the Broker of record, it received $65,000 from Coventry in exchange for not presenting the higher offer. This payoff was directly approved by Reid Buerger. (NYAG DOC. COVJD 00022656). Ultimately, Coventry closed the deal on February 4, 2005, for a gross offer of $930,000, which was below the competing $1 million gross offer noted by Gaynor. (NYAG DOC. COV 1194765). Once again, the Seller was not informed of the payoff made to LSA. (NYAG DOC. COV2 0007161).

F.   **A family-owned policy insuring a couple in their eighties**

65.   In April 2005, Coventry extended a gross offer of $650,000 to the family owners of a variable life insurance policy insuring a Florida couple in their eighties with a $4 million death benefit. (NYAG DOC. COVJD 00032741). On or about May 17, 2005, Jason Wyatt, Vice President of Advanced, contacted Dodaro and told him he had a higher offer from another Buyer and followed up with an email proposing a co-broker payment of 1 percentage point, or $40,000.

16

(NYAG DOC. COVJD 00032741).

66.    That same day, Dodaro reported the conversation to Buerger: "I told [Wyatt] 20K (1/2 pt). His offer (710K he says) is from [another Buyer] and we have a ton of room." (NYAG DOC. COVJD 00032741).

67.    Advanced's Wyatt continued to press for a full percentage point co-broker fee but Dodaro responded: "take the bird in the hand" because "a bird in the hand is worth two in the bush." (NYAG DOC. COVJD 00032760). In other words, a guaranteed one-half percentage point, $20,000, would be worth more to Advanced than submitting to the vagaries of actual competition, which could result in no commission to Advanced if Advanced failed to win the bidding war. Dodaro added: "I think what I offered is a no brainer for you." (NYAG DOC. COVJD 00032760).

68.    Two days later, on May 19, 2005, Dodaro reached out to Wyatt, asking: "we good?" On May 23, 2005, Wyatt responded: "I guess I will take the bird in the hand. I will call him Larry. I will send Eileen [Shovlin, Coventry Regional Vice President] the file so you can put us down for 20k. Good job!" (NYAG DOC. COVJD 00033623). Even after Wyatt agreed to the payment, doubts remained. Dodaro wrote to Neal Jacobs: "I am nervous that Advanced will try to pull a fast one. Please make sure the regional [manager] stays on top of this – I want to know if Advanced tries anything to win the case." (NYAG DOC. COVJD 00033539).

69.    Coventry closed the deal on July 18, 2005, Advanced received a co-broker fee of $20,000 (AS 0008072), and the Sellers never learned that Advanced had received a co-broker fee and had sold them out. (NYAG DOC. COV2 0005404).

G.    **A 79 year-old man living in California**

70.    In another transaction in 2005, Coventry offered $135,000 to a California Broker

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00

on a policy belonging to a 79 year-old California man with a death benefit of $1.2 million. Upon learning that LSA had a higher competing gross offer for $185,000, on May 5, 2005, Dodaro sent an email to Buerger asking him, "Do you want me to work out with LSA or let them have it?" (NYAG DOC. COVJD 00033016). The following day, Dodaro sent the following email to Coventry's accountant, "2 pts to LSA - co-broker." (NYAG DOC. COVJD 00033116). In return, LSA's higher offer was not presented to the client. LSA did in fact receive a co-broker payment of 2 percent of the $1.2 million death benefit, or $24,000.

71.     Prior to closing this case, on May 20, 2005, Jacobs emailed Dodaro that a third Broker, Trinity Financial Services LLC, also had a higher gross offer of $150,000: "Trinity has 150k and want to cooperate...I think I could get away w/5k..." (NYAG DOC. COVJD 00033131). Like LSA, Trinity received a co-broker payment of $5,000 for "cooperating" with Coventry. (NYAG DOC. COVJD 00035057).

72.     With LSA and Trinity satisfied, Coventry purchased the policy on June 22, 2005, for a gross amount of $140,000. The Seller never learned that two higher offers were made or that LSA and Trinity both received payoffs in exchange for suppressing the higher bids. (NYAG DOC. COV2 0007162).

H.     **A company-owned policy insuring an 83 year-old man**

73.     Another case involved agreements by Coventry and Advanced to restrain trade in the purchase of an $800,000 life insurance policy insuring an 83 year-old Florida man. In June 2005, Advanced had a bid from another Buyer for $231,000, higher than Coventry's offer at that time of $204,000. (AS008117). Scott Kirby, Co-President of Advanced, contacted Eileen Shovlin, Coventry's Regional Vice President, to discuss the policy. On July 20, 2005, she sent an email to Buerger and Dodaro noting that although Coventry and Advanced had been

18

competing for the policy, "now that we are talking. . .they called me to discuss." Seeking

approval of a co-broker payment to Advanced, she wrote: "Scott thinks 2 pts is fair on this. Pls

advise." Dodaro responded by asking Jacobs whether there was any "room" to pay Advanced,

and Jacobs replied "you can throw them [a] little cash." (NYAG DOC. COVJD 00009237-38).

That same day, Dodaro sent an email to Shovlin and Coventry's accounting department, "1.5

pts to Advanced – Co-broker." (NYAG DOC. COVJD 00038350). Coventry purchased the

policy for less than Advanced's $231,000 competing offer on September 8, 2005: it paid

$185,000 to the Seller and $19,000 in compensation to the Broker who agreed not to bid on the

policy. Coventry did "throw cash" to Advanced; specifically Coventry paid Advanced $12,000

(1.5% of the death benefit). Not surprisingly, the payoff to Advanced was not disclosed to the

Seller. (NYAG DOC. COV2-0001267).

## I. A policy insuring an 85 year-old man

74.      In January 2005, Coventry made a gross offer of $135,000 on the policy insuring

an 85 year-old Florida man with a $400,000 death benefit. (NYAG DOC. NJ 00028146). On

February 8, 2005, Dodaro emailed Jacobs stating that LSA, representing a competing Buyer,

had received a higher offer for the policy: "LSA can beat our 135K. How confident are we?"

(NYAG DOC. COV NJ 00012075). Jacobs explained that he lacked confidence that the Seller

would close with Coventry if LSA did indeed have a higher offer noting, "Is LSA offer still

good? if so, this guy would switch in a second so [I am] not very confident." (NYAG DOC. NJ

00012075).

75.      To ensure that Coventry would close the deal, Dodaro arranged for a $5,000 co-

broker payment to LSA and for Coventry to close the deal through another Broker, telling

Jacobs, "I bought insurance for 5K." (NYAG DOC. COVJD 00023061, NJ 00012075). The

Case# 2010-29237-0 Received at Montgomery County Prothonotary on 10/01/2010 1:35 PM, Fee = $251.00